1

2

3

4

5

6

7

8

9 **UNITED STATES DISTRICT COURT**

10 EASTERN DISTRICT OF CALIFORNIA

11

12 ERICA VALERO,                                                    Case No.  1:13-cv-01815-SKO

13                                                                          **ORDER ON PLAINTIFF'S COMPLAINT**
                                    Plaintiff,
                                                                          (Doc. Nos. 1, 15)
14          v.

15
   CAROLYN W. COLVIN,
16 Acting Commissioner of Social Security,

17
                                    Defendant.
18

19   _____

20                                          **INTRODUCTION**

21          Plaintiff Erica Valero ("Plaintiff") seeks judicial review of a final decision of the

22 Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

23 for Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.

24 42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were

25 submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate

26 Judge.[1]

27   _____

28 [1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

1

**FACTUAL BACKGROUND**

2      Plaintiff filed an application for DIB on August 19, 2010, alleging disability beginning on

3  December 1, 2007, due to carpal tunnel, depression, anxiety, shoulder problems, neck pain,

4  headaches, insomnia, fatigue, panic attacks, and arthritis.  (AR 191.)

5  **A.      Relevant Medical Evidence**

6      In November 2010, Plaintiff was evaluated by workers' compensation physician, William

7  J. Previte, D.O., regarding Plaintiff's claim for an injury she sustained while working as an office

8  assistant.  (AR 718-32.)  Dr. Previte completed a detailed history of Plaintiff's medical care and

9  work history.  Plaintiff stated she worked as an office assistant approximately 4 to 5 days per

10  week, 8 to 10 hours a day.  (AR 718.)  She began experiencing symptoms in December 2007

11  which included numbness, tingling, and pain in her wrists that over time radiated to her shoulders.

12  (AR 718.)  She went to see her primary care physician, and she was referred for electro diagnostic

13  studies.  (AR 718.)  Plaintiff reported those studies were abnormal and she filed a workers'

14  compensation claim in January 2008.  She continued to work through this time period, but when

15  she began treatment through the workers' compensation system, she was "taken off" work by the

16  doctors, which occurred at some time in early 2008.  (AR 718.)

17      In January 2008, it was noted that pain was increasing in her left arm and Plaintiff was

18  referred to neurosurgery.  (AR 719.)  She was also referred for evaluation of a sleep disorder, but

19  the study detected no sleep disorder.  (AR 719.)

20      In March 2008, Plaintiff was examined by Tomas B. Rios, M.D., as part of her workers'

21  compensation claim, and Plaintiff described hand and neck pain with bilateral hand numbness.

22  Examination showed positive Durkan's, Tinel's, and Phalen's tests, with symptoms greater on the

23  left than the right.  She was diagnosed with subacute cervical strain, bilateral wrist tendonitis,

24  bilateral carpal tunnel syndrome, and situational anxiety.  (AR 720.)  The treatment plan was to

25  request authorization for chiropractic visits, wrist splints on each arm, medication, and cervical X-

26  rays.  (AR 720.)

27      In April 2008, Plaintiff underwent a comprehensive medical evaluation with Dr. Rios.

28  (AR 720.)  The examination revealed positive carpal tunnel signs and Plaintiff was diagnosed with

cervical strain secondary to cumulative injuries occurring during employment.  (AR 720.)  The plan was to pursue hand surgery with Dr. Thomas E. Hoyt and to follow up with a magnetic resonance imaging scan ("MRI") of the cervical spine if surgery did not relieve these symptoms. (AR 720.)

Plaintiff underwent carpal tunnel release surgery on her left hand in April 2008.  (AR 322, 718.)   On April 23, 2008, Dr. Hoyt reported that Plaintiff was seen for follow-up after her left carpal tunnel release surgery, and she was "doing extremely well" following the operation.  (AR 322.)  He noted that her motor and sensory functions were improved "dramatically," and he would see her again for follow-up in the future.  (AR 322.)

On May 15, 2008, Plaintiff followed up with Dr. Hoyt, who noted she was "recovering nicely after her left carpal tunnel release."  (AR 297.)  Although Plaintiff still had numbness in her median nerve, the pain was "now gone."  (AR 297.)  Dr. Hoyt also indicated that Plaintiff "still has carpal tunnel symptoms in the right hand, primarily numbness and tingling, but not pain." Although Dr. Hoyt discussed surgery for her right hand, he stated Plaintiff wanted to see "how well the hand therapy works on the left side."  (AR 297.)  Plaintiff was to follow-up with Dr. Hoyt after completing her therapy.  (AR 297.)

In May 2008, Plaintiff returned to see Dr. Rios and reported persistent left neck and arm pain.  (AR 720.)  By July 2008, although physical therapy had been completed, Plaintiff still continued to report bilateral hand, neck, and shoulder pain.  (AR 720.)  She declined carpal tunnel release surgery on her right hand.  (AR 720.)  She was returned to modified work duty and was noted to be "weaning" off medication. (AR 720.)    In July 2008, Plaintiff followed up with Dr. Hoyt after completing hand therapy.  (AR 294.)  She no longer had any significant tenderness over the incision on her left hand, and she had good motor and sensory function in the median nerve distribution in the hand.  (AR 294.)  Plaintiff indicated her right hand was "not bothering her as badly as it once did," and Dr. Hoyt urged her to contact him in the future should the right hand begin to bother her and she could do the right carpal tunnel release.  (AR 294.)  In August 2008, Plaintiff was released back to full work duty.  (AR 720.)

On August 28, 2008, Plaintiff was examined again by Dr. Rios in connection with her workers' compensation claim.  (AR 1182-95.)   Dr. Rios reviewed Plaintiff's medical file and conducted an examination.  (AR 1182.)  At the time of her examination, Plaintiff was four and a half months post-carpal tunnel surgery on her left hand with no further change in her symptoms.  (AR 1183.)  Dr. Rios noted Plaintiff had refused surgery on her right hand, and she was presenting to Dr. Rios for her final examination and disposition of her claim.  (AR 1183.)  Plaintiff reported that she had an ache in her left hand with dull pain.  Plaintiff denied any sensory deficits in her hands at that time, and she indicated her left hand felt weak with grasping and heavy lifting activities.  (AR 1183.)  Dr. Rios provided the following comments and discussion based on his review of the record and examination findings:

> At this point in time, this patient continues to have ongoing subjective complaints of bilateral hand pain, which is described as an "ache" increasing to a "dull pain" with prolonged use (L>R).  There is full range of motion about the hands and wrists.  All orthopedic signs and tests were essentially unremarkable.  There does appear to be some sensory deficits in the wrists/hands (R>L), which in my clinical judgment could be expected.   It is my opinion that her ongoing subjective pain/discomfort is reasonable and proportional to her activity level.

> Pursuant to the absence of any further improvement, and her refusal of surgery on the right hand, it is my opinion that Erica Valero has attained maximum medical improvement.  Her ongoing subjective would be best described as **intermittent mild to slight, and is not labor disabling**.  She was released [] back to usual and customary work, effective today, August 28, 2008.

(AR 1192.)

In April 2009, Plaintiff again saw Dr. Rios and reported increased cervical stiffness and a flare up of the left wrist.  Medication was dispensed and the plan was for Plaintiff to continue with full duty work detail.  (AR 721.)  In July 2009, Plaintiff reported that she was unable to perform her modified work with the right hand, and it was noted she was awaiting surgery.  (AR 721.)

On September 11, 2009, Plaintiff was again examined by Dr. Rios who noted Plaintiff was experiencing an acute flare up of her right wrist and she wished to schedule surgery on her right hand.  (AR 1203.)  She was fitted with a right-wrist splint, and Dr. Rios noted her employer stated there was modified work she could perform.  (AR 1203.)

In October 2009, an electromyogram and nerve conduction velocity study ("EMG/NCV") study indicated mild to moderate right carpal tunnel syndrome affecting sensory and motor components. (AR 721.) Plaintiff again saw Dr. Rios and complained of persistent right upper extremity pain, but she was instructed to return to work on modified duty and to perform no work with her right hand until November 15, 2009. (AR 721, 1204.)

In October 2009, Plaintiff was also examined by Catalina Dureza, M.D., who diagnosed Plaintiff with bilateral carpal tunnel syndrome, left-shoulder impingement, and a mood disorder. (AR 722.)  The treatment plan included a right-hand carpal tunnel release, MRI testing of the left shoulder, and an EMG/NCV. (AR 722.)

Upon examination with Dr. Previte in November 2010, Plaintiff reported stiffness and tightness in her neck with pain radiating toward her shoulders bilaterally and headaches. She also continued to note weakness in gripping and grasping with numbness and tingling in both hands and rated her pain as an 8 out of 10. (AR 723-24.) Plaintiff reported her left carpal tunnel release had resulted in only limited benefit, and she was still awaiting her right hand carpal tunnel release surgery. (AR 723.) Although Plaintiff reported independence in her activities of daily living, she noted she required help with such items as laundry and preparation of meals. Dr. Previte noted Plaintiff's non-specialized hand functions such as gripping, grasping, twisting and torqueing were compromised, and Plaintiff was also compromised in her ability to perform fine manipulation such as writing or typing. (AR 724.) Dr. Previte noted Plaintiff appeared to have low-grade bursitis in her shoulders, right side slightly worse than left. (AR 727.) Dr. Previte opined Plaintiff was currently temporarily partially disabled:

> She is precluded from repetitive forceful use of both upper extremities as well as prolonged fine manipulation with both upper extremities.  I would allow her a 5-minute break from fine motor skill functions in both upper extremities such as typing, writing or fingering type movements each hour.  Temporary total disability between [January 2008] and [August 2008] would seem to have been indicated and appropriate in relationship to this industrial injury.

(AR 731.) Dr. Previte also made treatment recommendations:

> I believe that Ms. Valero should undergo right carpal tunnel release surgery.  In the postoperative period, therapeutic intervention with modalities and physical therapy

for the bilateral upper extremity, wrists and hands as well as the cervicotrapezius area would appear to be indicated.  At an appropriate point as determined by her Primary Treating Physician, her condition could be considered at maximum medical improvement, and I would be happy to either reevaluate her for discussion of permanent impairment issues, or review pertinent information in discussion such.

(AR 732.)

On December 27, 2010, Plaintiff underwent right hand/wrist carpal tunnel release surgery. (AR 1099.)

On January 21, 2011, state agency non-examining physician E. Wong, M.D., evaluated Plaintiff's medical records and assessed her condition.  (AR 774-78.)  Dr. Wong opined Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, or sit for approximately six hours in an eight-hour workday; and she could only push or pull with her upper extremities occasionally, secondary to the pain from her shoulder tendinitis and mild osteoarthritis.  (AR 775.)  Dr. Wong found Plaintiff limited to only occasional balancing and crawling, but that she could frequently climb, stoop, kneel, or crouch.  (AR 776.)  Plaintiff was also limited in her ability to reach overhead with her left arm, as well as in her ability to perform gross or fine manipulation with her right hand.  (AR 776.)

Kaiser Permanente treating records show Plaintiff sought treatment for depression and anxiety in July 2011.  (AR 851.)  She reported to her physician that her depression and anxiety stemmed from the pain in her arms and wrists due to her carpal tunnel syndrome.  (AR 851.)  She also reported that she was released to return to work by her workers' compensation doctor on July 18, 2011.  (AR 851.)  The treatment plan included continued psychotherapy as well as medication management.  (AR 853.)  It was noted that Plaintiff was already taking Xanax and Celexa as prescribed by her primary care physician.  (AR 853.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 71-91, 100-07.)  A hearing was held on June 15, 2012, before an ALJ where Plaintiff testified with the assistance of counsel, and a Vocational Expert ("VE") also gave testimony.  (AR 33-70.)

6

1

**1.      Plaintiff's Hearing Testimony**

Plaintiff testified she is 32 years old, single, and has two children ages 5 and 11.  (AR 39-40.)  She cares for her children with help from their father as well as Plaintiff's mother who also lives with her.  (AR 40.)  She has a driver's license and she drives once or twice a day to take her children to school.  Her treating physician Dr. Durazo treats her carpal tunnel syndrome, cervical pain syndrome, herniated disc, and her headaches.  (AR 42.)  She follows up with Dr. Durazo every month to two months.  (AR 42.)  Plaintiff currently takes prescriptions for Omeprazole, Hydrocodone with acetaminophen, Zoloft, and Xanax.  (AR 43.)  Her prescription for Risperdal has been replaced with another muscle relaxer.  (AR 44.)  Plaintiff continues to have pain in her lower back which her doctors attribute to a herniated disc and they have recommended surgery.  (AR 44.)  The pain in her lower back radiates to her legs all the way down to her feet, and she experiences numbness every day.  (AR 44-45.)  Her daily pain is an eight on a scale of one to 10, but laying down decreases the pain to a five or a six.  (AR 46.)

Plaintiff also experiences panic attacks, anxiety, and depression.  (AR 46.)  She experiences panic attacks about once a week and they cause her to cry, become irritated, experience dizziness and heavy breathing; they are accompanied by numbness and tingling in her feet and hands.  (AR 46-47.)  The depression causes her to feel fatigued every day.

She can stand in one place without moving for about 15 minutes at a time, she can walk for no more than 30 minutes, and in an eight-hour day she can walk or stand no more than two hours total.  (AR 47.)  She can sit for approximately one hour at a time, but not more than two hours total in an eight-hour day.  (AR 47.)  She can lift no more than approximately 10 pounds.  She is able to dress herself, bath, and cook light meals.  (AR 48.)  She does some shopping about twice a month, does laundry two to three times per week with help from her daughter, and her mother washes the dishes.  (AR 49.)  She is able to make her bed, but she cannot vacuum because it is too painful, and she does not take out the garbage or work in the yard.  (AR 49.)  On a typical day, she takes her children to school, returns home, takes medication, and goes back to sleep.  (AR 49.)  After napping, she will eat, watch television, pick up the children in the afternoon, take more medication, watch more television, and then make dinner.  (AR 49.)

1    Plaintiff completed high school and attended approximately 18 months of college; she
2    feels she could not continue her college education due to her anxiety.  (AR 50.)  Her household
3    income is limited to food stamps.  She last worked in October 2009 for "HHSA."  She developed
4    carpal tunnel while on the job which she was able to work through until October 2009.  (AR 52.)
5    She quit working due to the pain in her hands, arms, and shoulders, headaches, depression, and
6    anxiety.  (AR 53.)  She feels she cannot work now because she is in pain, and it is difficult to
7    move around.  Her depression also causes her fatigue.  (AR 54.)  She has no motivation to work
8    because her medication makes her sleepy and drowsy – she "can't function when [she's] on
9    medication." (AR 54.)

10    Her back pain makes it difficult for her to wake up in the morning – it is still painful and
11    "kind of locks up."  (AR 55.)  If she dropped a coin, she would not bend over to pick it up; she
12    does not climb stairs because of the pain, and she does no lifting over her head because it causes
13    pain in her shoulders.  (AR 56.)  She experiences numbness and tingling in her arms, and they
14    become swollen at times.  (AR 57.)  The pain in her hands is constant and Plaintiff rates her level
15    of pain at a five, but the pain increases when she uses her hands for activities such as combing her
16    hair or eating.  (AR 59.)

17    Plaintiff spends the majority of her time in bed, and five to six hours each day is spent
18    lying or sitting down with her legs elevated.  (AR 59.)  She naps about three hours of that time,
19    and she cries about once or twice a week.  (AR 60.)  About twice a week, Plaintiff's children are
20    taken to school by their father when Plaintiff cannot do it.

21    **2.    Testimony of Vocational Expert**

22    The VE characterized Plaintiff's past relevant work as that of a fast food worker and of a
23    routine office clerk.  (AR 64.)  The ALJ then posed several hypothetical questions for the VE's
24    consideration.  The ALJ first asked the VE to consider a person of Plaintiff's age, education, and
25    with her work experience.  The VE was to assume this person was precluded from repetitive,
26    forceful use of both upper extremities as well as from prolonged fine manipulation with both
27    upper extremities; this person would need a five-minute break from fine motor skill functions in
28    both upper extremities such as typing, writing, or fingering movements each hour.  (AR 64.)  The

8

1  VE testified that such a person could not perform Plaintiff's past relevant work, and there would be

2  no other work that such a person could perform.  (AR 65.)

3      In a second hypothetical, the VE was asked to assume a person of Plaintiff's age and with

4  her education and work history who was moderately limited in the ability to understand and

5  remember detailed tasks or carry out detailed instructions.  The ALJ defined moderate as being 20

6  percent "off task."  (AR 65.)  The VE testified that such a person would not be able to perform

7  Plaintiff's past relevant work, but could perform other work as a fast food worker.  (AR 65.)  The

8  ALJ then altered the hypothetical and defined moderate as being off task 10 percent of the time.

9  (AR 65.)  The VE testified such a person would retain the ability to be a fast food worker, and

10 could do Plaintiff's past relevant work as an office clerk under the modified definition of

11 moderate.  (AR 66.)

12     In a third hypothetical, the ALJ asked the VE to consider someone of Plaintiff's age and

13 with her education and work history.  This person would also be limited to carrying out simple,

14 repetitive, and routine tasks on a sustained basis, but may have moderate limitations performing

15 detailed or technical instructions.  The person could relate with coworkers, supervisors, and the

16 general public and could adapt to common stressors and changes associated with an unskilled

17 work environment.  (AR 66.)  The VE testified such a person could work as a fast food worker,

18 but could not perform work as a routine office clerk.  (AR 66.)

19     The ALJ posed a fourth hypothetical assuming someone of Plaintiff's age, and with the

20 same education and work history as Plaintiff who could lift 20 pounds only occasionally and 10

21 pounds frequently; stand and walk six hours out of an eight-hour workday; sit six hours out of an

22 eight-hour day; was limited to pushing and pulling in the left upper extremity to occasionally;

23 could occasionally climb ladders, ropes, or scaffolds, but could frequently climb ramps or stairs,

24 balance, stoop, kneel, crouch, or crawl; limited to occasional overhead reaching in the left upper

25 extremity; and perform basic handling and fingering with the right upper extremity with no

26 limitations in the left upper extremity.  (AR 66-67.)  The VE testified this person could perform

27 Plaintiff's past relevant work.

28

1   Plaintiff's counsel asked a follow-up question regarding a hypothetical worker who would
2   be moderately limited by being off task 20 percent of the time.  (AR 67.)  Plaintiff's counsel asked
3   whether there would be work available if this person were to miss four days out of a typical
4   month.  The VE testified there would be no work available if a person missed that amount of work
5   each month.  (AR 68.)

6   Plaintiff's counsel also asked whether a person limited in the manner as posed in
7   hypothetical four who required two additional unscheduled 30-minute breaks every day could
8   perform Plaintiff's past relevant work or any other work.  The VE testified such a person could
9   neither perform Plaintiff's past relevant work nor perform any other work.  (AR 68.)

10   **3.    The ALJ's Decision**

11   On August 3, 2012, the ALJ issued a decision, finding Plaintiff not disabled since
12   December 1, 2007.  (AR 12-21.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in
13   substantial gainful activity since December 1, 2007 (AR 14); (2) Plaintiff had severe impairments,
14   including bilateral carpal tunnel syndrome, status post carpal tunnel release bilaterally, cervical
15   spine sprain/strain with cervical trapezius myofascial pain syndrome, left shoulder impingement
16   syndrome, L5-SI disc bulge with nerve root compromise, dehydration, possible annulus tear,
17   anxiety, and depression (AR 14); (3) did not have an impairment or combination of impairments
18   that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,
19   Appendix 1  (AR 15); and (4) had the residual functional capacity  ("RFC")  to perform light work
20   with the following modifications:  limited to lifting and carrying 20 pounds occasionally, and 10
21   pounds frequently; standing, sitting, and/or walking about six hours of an eight hour workday;
22   occasional push/pulling with the left upper extremity; occasional climbing of ladders, ropes, and
23   scaffolds, and crawling; occasional overhead reaching with the left upper extremity; frequent basic
24   handling/finger with the right upper extremity; able to understand, remember, and carry out simple
25   repetitive routine tasks on a sustained basis; moderate limitations in performing detailed and/or
26   technical instructions; able to relate with co-workers, supervisors, and the general public; and can
27   adapt to common stressors and changes associated with an unskilled work environment (AR 16).
28   The ALJ found that Plaintiff could perform her past relevant work as a fast food worker.  (AR 19.)

1  The ALJ concluded Plaintiff was not disabled as defined by the Social Security Act at any time

2  from December 1, 2007, through the date of decision.  (AR 21.)

3      Plaintiff sought review by the Appeals Council on August 27, 2012.  (AR 5-8.)  The

4  Appeals Council denied Plaintiff's request for review on September 12, 2013.  (AR 1-4.)

5  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §

6  416.1481.

7  **C.      Plaintiff's Argument on Appeal**

8      On November 8, 2013, Plaintiff filed a complaint before this Court seeking review of the

9  ALJ's decisions.  Plaintiff argues the ALJ erred in failing to properly evaluate the opinion of Dr.

10  Previte, accepted testimony from the VE that conflicted with the Dictionary of Occupational Titles

11  ("DOT") with no reasoning, and improperly rejected Plaintiff's lay testimony.

12                                **SCOPE OF REVIEW**

13      The ALJ's decision denying benefits "will be disturbed only if that decision is not

14  supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599,

15  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

16  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

17  Instead, the Court must determine whether the Commissioner applied the proper legal standards

18  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

19  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  "Substantial evidence is more than a mere

20  scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th

21  Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might

22  accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

23  (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must

24  consider the entire record as a whole, weighing both the evidence that supports and the evidence

25  that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

26  specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

27  2007) (citation and internal quotation marks omitted).

28

1

**APPLICABLE LAW**

2    An individual is considered disabled for purposes of disability benefits if he or she is

3    unable to engage in any substantial, gainful activity by reason of any medically determinable

4    physical or mental impairment that can be expected to result in death or that has lasted, or can be

5    expected to last, for a continuous period of not less than twelve months.   42 U.S.C.

6    §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The

7    impairment or impairments must result from anatomical, physiological, or psychological

8    abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic

9    techniques and must be of such severity that the claimant is not only unable to do her previous

10   work, but cannot, considering her age, education, and work experience, engage in any other kind

11   of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3),

12   1382c(a)(3)(B), (D).

13   The regulations provide that the ALJ must undertake a specific five-step sequential

14   analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine

15   whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§

16   404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

17   has a severe impairment or a combination of impairments significantly limiting her from

18   performing basic work activities.  *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ

19   must determine whether the claimant has a severe impairment or combination of impairments that

20   meets or equals the requirements of the Listing of Impairments ("Listing"),   20 C.F.R. 404,

21   Subpart P, App. 1.   *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must

22   determine whether the claimant has sufficient residual functional capacity despite the impairment

23   or various limitations to perform her past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in the Fifth

24   Step, the burden shifts to the Commissioner to show that the claimant can perform other work that

25   exists in significant numbers in the national economy.   *Id*. §§ 404.1520(g), 416.920(g).   If a

26   claimant is found to be disabled or not disabled at any step in the sequence, there is no need to

27   consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§

28   404.1520, 416.920.

**DISCUSSION**

**A.      The ALJ Failed to Properly Consider Dr. Previte's Opinion**

The ALJ assigned "little weight" to the opinion of Dr. Previte noting that he had used a different disability standard when he evaluated the claimant and noted that a decision by another government agency about disability is not binding on the Social Security Administration. (AR 19.)  Plaintiff contends the ALJ's rejection of Dr. Previte on this ground was impermissible, and the Commissioner disagrees.

Plaintiff first argues that Dr. Previte is an orthopedic specialist, and his opinion as a specialist was entitled to deference pursuant to 20 C.F.R. § 404.1527(c)(5).  Dr. Previte was the only examining physician who reviewed all of the pertinent medical records in forming his opinion.  The opinion the ALJ credited was that of Dr. Wong, a non-examining physician whose opinion does not constitute substantial evidence in the face of Dr. Previte's opinion, particularly because it was completed in a check-box form.  Finally, the ALJ's reason for discounting Dr. Previte is not legally sufficient as there is no authority that a physician who renders an opinion for the worker's compensation system cannot be credited.  The Commissioner argues the ALJ was entitled to credit the opinions of Drs. Wong and Rios over the opinion of Dr. Previte.

"[T]he ALJ may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings."  *Booth v. Barnhart*, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002) (citing *Coria v. Heckler*, 750 F.2d 247, 248 (3d Cir. 1984)).  Moreover, "[w]hile the ALJ's decision need not contain an explicit 'translation,' it should at least indicate that the ALJ recognized the differences between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand and took those differences into account in evaluating the medical evidence." *Id.*

Although Dr. Previte's opinion that Plaintiff was "temporarily partially disabled from January 2008 through August 2008" is not binding on the ALJ as it was based on the disability standards of the workers' compensation system, Dr. Previte also gave an opinion specific to Plaintiff's functional abilities.  Dr. Previte opined that Plaintiff was precluded from repetitive

forceful use of both upper extremities as well as prolonged fine manipulation with both upper extremities and that Plaintiff was required to take a five-minute break from the fine motor skill functions in both upper extremities, such as typing, writing, or fingering-type movements each hour.   As discussed by the Third Circuit in *Coria*, 750 F.2d at 247-48, "it is important to distinguish between those portions of the physicians' reports that represent the physician[s]' medical findings and those portions of the reports that represent conclusions as to the claimant's disability for purposes of worker's compensation."   Thus, while a physician's conclusions about the ultimate issue of disability under the  workers' compensation system can be properly rejected as predicated on a different disability standard, "the physicians' findings, *qua* findings, do not necessarily suffer from similar defects" and should be weighed by the ALJ like any other medical evidence.  *Id.*  Dr. Previte's opinion about Plaintiff's functional limitations was not a conclusion about legal disability as determined under the workers' compensation system -- it was an opinion about Plaintiff's physical limitations.   Plaintiff also notes that Dr. Previte's opinion that Plaintiff was precluded from "repetitive" forceful use of both upper extremities is a term of art under the workers' compensation system for which the ALJ was required to account and translate for purposes of determining the analogous limitation under the social security system.   The ALJ rejected Dr. Previte's entire opinion as being predicated on the workers' compensation disability standards, and failed to discuss any of his objective examination findings or his opinion about Plaintiff's physical limitations.  Rejecting all of Dr. Previte's report only because it was formulated for the purposes of a workers' compensation claim is not legitimate reasoning.

The rejection of Dr. Previte's opinion because it was rendered under the workers' compensation framework is especially arbitrary because the ALJ credited Dr. Rios' opinion that Plaintiff did not "fit the criteria for a medically qualified worker."  (AR 18.)  Dr. Rios examined Plaintiff for purposes of her workers' compensation claim.  The portion of his opinion credited by the ALJ appears to relate to causation under the workers' compensation disability paradigm, which is precisely the type of opinion that has no real value for determining disability under the social security paradigm.  Although Dr. Rios made examination findings, none of those were discussed by the ALJ.  The ALJ's rejection of Dr. Previte's opinion about Plaintiff's limitations in favor of

1   Dr. Rios' ultimate opinion that Plaintiff did not "fit the criteria for a medically qualified worker" is

2   not legitimate or legally sufficient.   Moreover, the opinion of Dr. Rios the ALJ credited was

3   formulated over a year *before* Dr. Previte's November 2010 opinion, and there is some evidence

4   Plaintiff's condition in her arms was worsening between 2009 and 2010, particularly as it related

5   to her right wrist/hand for which she underwent surgery in 2010.

6        The ALJ also gave weight to Dr. Wong's opinion, but Dr. Wong was not an examining

7   physician and it appears he did not review Dr. Previte's November 2010 examination report.

8   Specifically, Dr. Wong marked a box indicating there was no treating or examining source

9   statement regarding the claimant's physical capacities in the file.[2]   (AR 778.)   Because his opinion

10  was apparently not predicated on a review of Plaintiff's pertinent medical evidence – i.e., Dr.

11  Previte's opinion – it does not constitute substantial evidence.   *See Campbell v. Astrue*, 627 F.3d

12  299, 309 (7th Cir. 2010) (non-examining physician reviewed only a portion of the record in

13  reaching opinion and thus was not entitled to greater weight than the treating psychiatrist).   In

14  crediting Dr. Wong's opinion, the ALJ noted that the "medical record also contains evidence that

15  the claimant was permitted to return to work, which verifies [Dr. Wong's] opinion."   (AR 18.)

16  However, the notation to which the ALJ referred was a report made by Plaintiff to another

17  physician that she had been released to work in July 2011.   (AR 851.)   The actual examination

18  report releasing Plaintiff to work is not in the record.   As a result, there is no evidence what work

19  modifications or limitations, if any, were contained in Plaintiff's July 2011 work release.   The

20  mere fact that Plaintiff was released back to work does not support Dr. Wong's specific opinions

21  about Plaintiff's ability to use her hands and arms for reaching, fingering (fine manipulation), and

22  handling (gross manipulation).   (*See* AR 776.)   Although the release back to work in 2011

23  suggests Plaintiff had improved after her December 2010 carpal tunnel release surgery, there is

24  nothing showing her physical capacity in July 2011, particularly as it related to her ability to use

25  her hands and arms.[3]

26
27  [2]  This box is also checked if there is an examining or treating physician opinion in the file, but it does not provide any
     specific opinion about the claimant's limitations.   Dr. Previte's opinion contained evidence about the degree of
     Plaintiff's limitation in her arms.
28  [3]  It is worth noting, however, that Plaintiff stated she refused to return to work not because of pain or limitation in her
     arms, but because she felt she suffered too much anxiety, depression, and panic to return to work.

1    While Defendant argues the ALJ was entitled to credit the opinions of Drs. Rios and Wong

2  over the opinion of Dr. Previte, there was no legitimate basis stated by the ALJ for doing so.   The

3  Commissioner argues the ALJ was entitled to weigh Dr. Rios' opinion more heavily because the

4  ALJ noted that after Plaintiff underwent carpal tunnel release on her right wrist, she was deemed

5  to have been "doing extremely well" when she was examined by Dr. Hoyt, corroborating Dr. Rios'

6  opinion.  (AR 17 (citing Exhibit 4F, p. 40); AR 322.)  However, Dr. Hoyt's report referenced by

7  the ALJ was made on <u>April 23, 2008</u>, after Plaintiff's *left* carpal tunnel release surgery (AR 322),

8  and *not* after her <u>December 2010</u> carpal tunnel surgery on her *right* hand/wrist.   The ALJ's

9  reference to Dr. Hoyt's 2008 opinion does not show that Plaintiff was doing extremely well after

10  her December 2010 surgery or after Dr. Previte's November 2010 examination and opinion.

11    Plaintiff also argues the ALJ erred in not "translating" Dr. Previte's opinion that Plaintiff is

12  precluded from repetitive forceful use of both upper extremities as well as prolonged fine

13  manipulation of both upper extremities into terminology that is applicable in the Social Security

14  Context.  (*See* AR 1067.)  According to Plaintiff, the word "repetitive" is a term of art used in the

15  workers' compensation setting which means that a claimant has lost 50 percent of her pre-injury

16  capacity.  *Brooks v. Astrue*, No. CV 11-8645-JEM, 2012 WL 2373628, *5 (C.D. Cal. June 22,

17  2012) (citing California Department of Industrial Relations, Division of Workers' Compensation,

18  *Schedule for Rating Permanent Disabilities under the Provisions of the Labor Code of the State of*

19  *California* 1-13, 2-14 (1997), available at http://www.dir.ca.gov/dwc/PDR1997.pdf).   Assuming

20  Plaintiff had 100 percent use of her upper extremities prior to her carpal tunnel injury, Dr.

21  Previte's preclusion on repetitive use prohibits Plaintiff from using *both* her upper extremities

22  more than 50 percent of the time.

23    Although the terms of art used by physicians rendering opinions within the California

24  workers' compensation cases are not equivalent to Social Security disability terminology, the ALJ

25  is required to consider physician's opinions from a workers' compensation case.  *Booth*, 181 F.

26  Supp. 2d at 1104; *see also Desrosiers v. Sec'y of Health & Human Services*, 846 F.2d 573, 576

27  (9th Cir. 1988) (noting differences between workers' compensation system and Social Security

28  disability scheme).  Under the Social Security disability framework, the amount of time spent on

various tasks/movements in a job are characterized as "constant," "frequent," and "occasional." Frequent is a duration that Social Security defines as occurring over one-third to two-thirds of the time – thus, Dr. Previte's opinion that Plaintiff is precluded from repetitive use of her arms appears to indicate she can perform activities with her hands and arms, such as handling and reaching, on a less-than-frequent basis.  The VE testified that a person precluded from repetitive, forceful use of both upper extremities as well as from prolonged fine manipulation with both upper extremities would not be able to perform Plaintiff's past relevant work.  (AR 64-65.)   Her past relevant work requires frequent or constant handling, fingering, and reaching with the upper extremities.  Aside from not stating legitimate reasons for rejecting Dr. Previte's opinion, Dr. Previte's opinion bears on Plaintiff's ability to use both her arms.  In undertaking renewed consideration of Dr. Previte's opinion, the ALJ should consider the terminology used by Dr. Previte to determine how it impacts Plaintiff's ability to use her upper extremities.  Moreover, as there are no examination records of Plaintiff's hands and wrists following her right carpal tunnel surgery in December 2010, the ALJ may be required to obtain a compensation examination to determine her limitations following her surgery – particularly in view of the fact that she was apparently returned to work by her workers' compensation physicians in July 2011.

**B.** **Apparent Conflict Between the VE Testimony and the DOT**

Plaintiff argues the ALJ's RFC assessment limited Plaintiff to only occasional overhead reaching, which conflicts with the VE's testimony that Plaintiff can perform her past relevant work as a fast food worker which requires "constant" reaching under the DOT.  Thus, the VE's testimony that Plaintiff could perform her past relevant work as a fast food worker is in apparent conflict with the DOT description of that job.  Plaintiff contends the VE and the ALJ failed to account for this inconsistency.

In determining whether appropriate jobs exist for the claimant, the ALJ generally will refer to the DOT.  *Light v. Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).  The procedural requirements of Social Security Ruling ("SSR") 00-4p ensure that the record is clear as to why an ALJ relied on a vocational expert's testimony, particularly in cases where the expert's testimony conflicts with the DOT.  In making disability determinations, the ALJ may rely on VE testimony

1    that contradicts the DOT, but only insofar as the record contains persuasive evidence to support

2    the deviation.  *Light*, 119 F.3d at 793; *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995);

3    *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).  Although evidence provided by a VE

4    "generally should be consistent" with the DOT, "[n]either the DOT nor the VE . . . evidence

5    automatically 'trumps' when there is a conflict."   SSR 00-4p at *2.   Thus, the ALJ must first

6    determine whether a conflict exists, and if it does, must then determine whether the VE's

7    explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather

8    than the DOT.  *Id.* at *2-3.

9          Only after determining whether the VE has deviated from the DOT, and whether any

10   deviation is reasonable, can an ALJ properly rely on the VE's testimony as substantial evidence to

11   support a disability determination.  *Massachi*, 486 F.3d at 1152-54.  Evidence sufficient to support

12   a deviation from the DOT may be either specific findings of fact regarding plaintiff's ability to

13   perform particular jobs, or inferences drawn from the context of the expert's testimony.  *See*

14   *Johnson*, 60 F.3d at 1435 n. 7 (ALJ provided sufficient support for deviation by noting that the VE

15   described characteristics and requirements of jobs in the local area consistent with claimant's

16   RFC); *Terry v. Sullivan*, 903 F.2d 1273, 1279 (9th Cir. 1990) (ALJ may infer support for deviation

17   where VE's understanding of applicable legal standards is clear from context).

18         The distinction between a claimant's limitation for overhead reaching and the DOT's

19   description of jobs requiring reaching in general was addressed by the district court in *Winder v.*

20   *Astrue*, No. 12-CV-1048, 2013 WL 489611 (C.D. Cal. Feb. 6, 2013).  In *Winder*, the claimant

21   ("Winder") was limited to occasional overhead reaching.  *Id.* at *2.  The VE testified that Winder

22   could perform the jobs of assembler -- small products, information clerk, and office helper and

23   that this testimony was consistent with the DOT.  *Id.*  Each job identified by the VE, however,

24   required "frequent" reaching pursuant to the DOT description.  *Id.*  The district court held there

25   was unresolved potential inconsistency between the VE's testimony and the DOT description

26   requiring frequent reaching.  *Id.*  The court reasoned it was not clear whether the DOT's general

27   reaching limitation included reaching above shoulder level, which was exactly the sort of

28   ambiguity and inconsistency the ALJ should have resolved with expert testimony.  *Id.* at *3.  The

1   court concluded that the record did not contain any basis for the VE's deviations from the DOT's

2   general reaching requirements, and the court was unable to determine whether the ALJ properly

3   relied upon the VE's testimony.   *Id.*   Accordingly, the matter was remanded for further

4   consideration.

5   Similarly, in *Richardson v. Astrue*, the claimant was precluded from overhead reaching.

6   11-CV-1593-SP, 2012 WL 1425130, at *3 (C.D. Cal. Apr. 25, 2012).   All the alternative work

7   identified by the VE required reaching pursuant to the DOT descriptions, but there was nothing

8   that indicated whether bilateral overhead reaching was a subset of reaching in general.  *Id.* at *3.

9   As discussed by the court in *Winder*, the court noted that reaching is defined by the DOT as

10  extending the hands in any direction and that reaching in any direction plainly encompasses

11  overhead reaching.   Thus, the court concluded the VE's testimony deviated from the DOT, and the

12  ALJ failed to obtain an explanation for the deviation or even to identify it.  *Id.* at *4.   To accept

13  VE testimony that deviated from the DOT, the ALJ was required to obtain "persuasive evidence to

14  support the deviation," but the record was "utterly devoid of such evidence . . .  or any explanation

15  by the ALJ how she resolved the conflict."  *Id.* at *5.   The court found the ALJ erred in failing to

16  obtain such an explanation for the deviation, and remanded the matter for further consideration.

17  *Id.* at 6.

18  The Commissioner argues that Plaintiff is only limited to overhead reaching with her left

19  arm, and the DOT does not state that jobs requiring reaching necessarily involves the use of *both*

20  hands absent evidence to the contrary.   Thus, there is no actual conflict as Plaintiff is not restricted

21  from reaching at any level with her right arm.

22  Here, Plaintiff's past relevant work requires constant handling and reaching – i.e., more

23  than two-thirds of the time.   DICOT 3.11.471-010.   The reasoning of *Winder* and *Richardson*

24  persuades the Court that, at a minimum, there is a potential conflict between the VE's testimony

25  about Plaintiff's ability to perform her past work and the DOT description of that work.   On its

26  face, the DOT description requiring "constant reaching" is at odds with Plaintiff's limitation of

27  only "occasional overhead reaching" with her left arm because overhead reaching is a specific

28  subset of reaching.   Further, Plaintiff is limited to only frequent handling with her right arm, while

1   her past relevant work requires constant handling, although it is not clear there is a need for

2   *bilateral* handling.   In other words, testimony that a claimant who is limited to occasional

3   overhead reaching on the left *and* only frequently handling on the right can nonetheless perform

4   constant reaching and handling generally is the type of deviation that requires explanation and

5   testimony from an expert.  *Prochaska v. Barnhart,* 454 F.3d 731, 736 (7th Cir. 2006).

6        While Defendant is correct that a VE is a competent expert who can resolve such potential

7   conflicts with an explanation, no explanation was offered in this case nor did the ALJ solicit an

8   explanation.  Instead, the record contains only the VE's conclusion that Plaintiff can perform work

9   requiring "constant reaching" and "constant handling" despite that she can only perform

10  "occasional overhead reaching" with her left arm and can only frequently handle with her right

11  arm.  Where an ALJ fails to obtain an explanation for and resolve an apparent conflict – even

12  where the VE did not identify the conflict – the ALJ errs.  *Richardson*, 2012 WL 1425130, at * 5

13  (citing *Hernandez v. Astrue*, No. CV 10-3142, 2011 WL 223595, at *2-5 (C.D. Cal. Jan 21,

14  2011)).

15       Additionally, Dr. Previte opined Plaintiff was precluded from repetitive use of both her

16  arms.  Because the ALJ must reconsider the opinion of Dr. Previte on remand, any limitations

17  accepted from Dr. Previte's opinion may impact the testimony of the VE regarding Plaintiff's

18  ability to perform her past relevant work.

19  **C.      Plaintiff's Credibility Was Adequately Considered**

20       Plaintiff contends the ALJ failed to provide clear and convincing reasons for discrediting

21  her lay testimony.

22       The ALJ offered several reasons for refusing to credit Plaintiff's lay statements regarding

23  her limitations and pain.  First, the ALJ noted that at Plaintiff's initial interview with Social

24  Security, her answers were "evasive and vague at times" and left the impression that Plaintiff

25  "may have been less than entirely candid."  (AR 18, 188.)  Plaintiff asserts the Social Security

26  employee conducting the interview never expressly found Plaintiff to be evasive.  The interviewer

27  noted Plaintiff did not "exhibit any difficulty other than she would seem to take a while to answer

28  simple questions as though she was thinking of the 'right' answer.  Or she would go back and add

1   to her answer after we had already discussed the issue and moved on to other questions."  (AR

2   188.)   While the interviewer did not expressly indicate Plaintiff was evasive in answering

3   questions, the ALJ's interpretation of the interview note is reasonable.  The note is susceptible to

4   the inference that because Plaintiff was taking too long to answer questions and she appeared to be

5   trying to think of the "right" answer, Plaintiff was answering in a less-than-candid manner.  This is

6   the type of credibility factor the ALJ is entitled to consider.  Although Plaintiff argues the ALJ had

7   no express basis for his opinion about the veracity of her answers to the interview questions, the

8   ALJ's interpretation controls so long as it is reasonable and supported by substantial evidence.

9   *Batson v. Comm'r of Soc. Sec. Admin*., 359 F.3d 1190 (9th Cir. 2004) ("[T]he Commissioner's

10  findings are upheld if supported by inferences reasonably drawn from the record, and if evidence

11  exists to support more than one rational interpretation, we must defer to the Commissioner's

12  decision.").   As the interviewer notes are susceptible to the interpretation the ALJ offered, the

13  ALJ's reasoning is given deference.  *Id.*

14       Second, the ALJ noted Plaintiff informed one of her physicians that she had been released

15  back to work in July 2011.  (AR 851.)  Plaintiff argues that even though a physician recommended

16  she return to work, Plaintiff stated she could not return to work because of symptoms of

17  depression, anxiety, and panic.  (Doc. 12, 14:12-15 (citing AR 851).)  In July 2011, Plaintiff was

18  seen at Kaiser Permanente for depression, panic, and anxiety.  (AR 851.)  She reported her mental

19  health issues stemmed from the pain in her hands, wrists, arms, and shoulders.   (AR 851.)

20  Plaintiff also indicated she had been released to return to work by a workers' compensation doctor

21  on July 18, 2011, but she had not returned to work because of her symptoms of depression,

22  anxiety, and panic.  (AR 851.)  While Plaintiff's release to work by her workers' compensation

23  physician may have no bearing on her mental health symptoms, it does have relevance to the pain

24  and limitation Plaintiff alleged resulted from her hands, wrists, and shoulders following her two

25  carpal tunnel release surgeries in 2008 and 2010.    This was a basis to reject Plaintiff's lay

26  statements about the extent of her pain and limitation stemming from her carpal tunnel syndrome

27  in both arms.

28

1    Third, the ALJ also deemed Plaintiff less than fully credible in claiming complete inability

2  to work due to pain and mental health symptoms by noting that she is able to care for young

3  children at home, which can be "quite demanding both physically and emotionally."   (AR 18

4  (citing AR 212).)  Plaintiff argues that in considering her daily activity of caring for her children,

5  the ALJ did not consider how this activity translates to work activities eight hours a day, five days

6  a week.

7    While the ALJ did not expressly translate Plaintiff's activity in caring for her children into

8  a workplace setting, the Court does not perceive any error in considering this as an element of

9  Plaintiff's credibility.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (caring for needs of

10 children proper credibility consideration).  Caring for young children with whom one lives can be

11 demanding in terms of scheduling, transporting children to school, helping with homework, and

12 assisting the children in their own personal care.  Although Plaintiff testified that her mother lived

13 with her (AR 40-41) and provided her some assistance with her children (ages five and eleven at

14 the time of the hearing (AR 40)), she nonetheless maintained activities with the children including

15 feeding them (AR 211-12), doing their laundry, and taking them to and from school or the bus

16 stop (AR 41).  While Plaintiff was not specific about how regularly she performed these activities,

17 the ALJ's interpretation is reasonable, supported by substantial evidence, and is thus entitled to

18 deference.  *Rollins*, 261 F.3d at 857.

19   These reasons together offer clear and convincing explanations why the ALJ did not find

20 Plaintiff entirely credible.   The ALJ's conclusion, while potentially at odds with another's

21 interpretation of that same evidence, is reasonable and supported by substantial evidence.

22 **D     Remand is Appropriate**

23   As a general rule, remand is warranted where additional administrative proceedings could

24 remedy the defects in the Commissioner's decision.  *See Harmon v. Apfel*, 211 F.3d 1172, 1179

25 (9th Cir. 2000).   In this case, remand is appropriate for renewed consideration of Dr. Previte's

26 opinion and for the ALJ to consider whether an examination as to Plaintiff's physical limitations is

27 warranted.  To the extent Dr. Previte's opinion is not credited, the ALJ must obtain testimony from

28 a VE to resolve the apparent conflict between the VE's testimony and the DOT's description of a

1  fast food worker's reaching and handling requirements.  The ALJ is instructed to take whatever

2  further action is deemed appropriate and consistent with this decision.

3                                        **CONCLUSION**

4          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

5  substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for

6  further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter

7  judgment in favor of Plaintiff Erica Valero and against Defendant Carolyn W. Colvin, Acting

8  Commissioner of Social Security.

9

10  IT IS SO ORDERED.

11      Dated:   **March 16, 2015**                        **/s/ Sheila K. Oberto**
                                                UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28